UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

In re:

THOMAS MICHAEL TAFFE and
DEVONY LOUISE LEHNER,

　　　　Debtors.

Case No. A13-00199-GS
Chapter 11

**MEMORANDUM ON MOTION
FOR RELIEF FROM STAY**

　　　First National Bank Alaska ("FNBA") noticed a foreclosure of Thomas Taffe's and Devony Lehner's (collectively, the "debtors") interests in Stream Hill Park Subdivision, located in Homer, Alaska for 10:00 a.m. on April 18, 2013. The debtors, proceeding *pro se,* sought to stay the foreclosure by filing a chapter 11 bankruptcy petition. They sent their petition to the bankruptcy court via Express Mail one day before the scheduled foreclosure sale. The petition was not received by the court until after the foreclosure sale had occurred, at which FNBA purchased the real property through an offset bid. The debtors' bankruptcy petition was docketed shortly after the sale but before the trustee's deed was executed. FNBA filed its *Motion for Relief From Stay* ("*Motion*") to terminate the stay so that the trustee's deed may be executed and recorded. The debtors oppose the *Motion*. They argue that the foreclosure sale did not terminate their ownership of the property because FNBA improperly noticed the foreclosure, and their bankruptcy was filed before execution and delivery of the trustee's deed.

　　　A final hearing on the *Motion* was held on June 24, 2013. Thomas Taffe appeared on his own behalf. Bruce Moore appeared for FNBA. For the following reasons, the court will grant the *Motion*.

**Facts**

The debtors own, and have attempted to develop, real property in Homer, Alaska known as Stream Hill Park. On October 31, 2006, they executed and recorded a *Master Declaration and Other Governing Documents - Stream Hill Park Subdivision* ("*Master Declaration*"), in furtherance of establishing a common interest community under Alaska law.[1] The *Master Declaration* states that Stream Hill Park is a limited liability expense planned community under AS 34.08.030.[2] The planned community was to consist of 72 residential lots and several common interest ownership tracts designated for equestrian, dog park, hiking, and other uses.[3] The initial plat, recorded in 2006 and existing at the time the debtors recorded their *Master Declaration*, consisted of 30 individual lots, surrounded by an additional 85.458 acres known as Tract B-2-A.[4]

FNBA financed the debtors' development of Stream Hill Park through a series of loans. On May 20, 2008, the debtors signed a promissory note in the amount of $2,154,000, payable in a lump sum, together with accrued interest, by November 20, 2009 ("the *Note*").[5] To secure the *Note*, the debtors also executed a *Deed of Trust* encumbering Lots 1-4, 9, 12-20, and 22 and all of Tract B-2-A, Stream Hill Park Unit 1, Plat No. 2006-54 in the Homer

---

[1] FNBA's *Reply to Opp'n to Mot. for Relief from Stay* (Docket No. 22), Ex. 2.

[2] *Id.* at 1.

[3] *Id.* at 2-3.

[4] FNBA's *Supplemental Mem. Hr'g on Relief from Stay* (Docket No. 33), at 2, Ex. B at 1.

[5] FNBA's *Mot. for Relief from Stay* (Docket No. 6), Ex. A.

Recording District ("the *Property*").[6]  Two years later, the debtors recorded Plat No. 2008-48, which created additional individual lots and subdivided Tract B-2-A into Tracts A-H.[7]

By November 20, 2009, the original due date for the *Note*, the local economy had declined and the Stream Hill Park project had fallen on hard times.  The debtors and FNBA twice entered into agreements to extend the maturity date of the loan.[8]  Under the last agreement, the loan balance came due on October 20, 2011.  In recognition of the tough economic conditions of the time, FNBA did not move to foreclose on the Property until late in 2012.  On November 16, 2012, FNBA recorded its *Notice of Default and Deed of Trust Foreclosure Sale* for Lots 1, 2, 4, 9, 12-20, and 22 of Stream Hill Park Unit 1, according to Plat No. 2006-54, as well as Lots 36-38, 41-44 and 46-50, and Tracts H and J of Stream Hill Park Unit 2 according to Plat No. 2008-48, "said lots comprising a portion of the former Tract B-2-A, STREAM HILL PARK UNIT 1, Plat 2006-54, as shown the subject deed of trust."[9]  FNBA recorded an *Amended and Restated Notice of Default and Deed of Trust Foreclosure Sale* on January 17, 2013, to add the following property to the foreclosure:

> Tracts A, B, C, D, E and G, STREAM HILL PARK UNIT 2, according to Plat 2008-48, in the Homer Recording District, Third Judicial District, State of Alaska; said lots comprising a portion of the former Tract B-2-A, STREAM HILL PARK UNIT 1, Plat No. 2006-54, as shown on the subject deed of trust; and

---

[6] *Id.*, Ex. B.

[7] FNBA's *Supplemental Mem.* (Docket No. 33), Ex. C.  The original 30 lots were unaffected by the replat.

[8] Debtor's Ex. 19, *Change in Terms Agreement* dated Feb. 1, 2010, and *Change in Terms Agreement* dated Nov. 29, 2010.

[9] FNBA's *Supplemental Mem.* (Docket No. 33), Ex. D.

The Development Rights and Special Declarant Rights, if any, contained in the Master Declaration recorded October 31, 2006 at Instrument No. 2006-005066-0 in the records of the Homer Recording District, Third Judicial District, State of Alaska.[10]

The *Amended Notice* scheduled the foreclosure sale for April 18, 2013 at 10:00 a.m. FNBA mailed the *Amended Notice* to the debtors, the Stream Hill Homeowners Association (c/o Thomas Taffe), Michael Hough,[11] and to the attention of the occupants of the individual lots subject to the foreclosure at their respective street addresses. Eric Niebuhr, an FNBA employee, testified that he both inspected and posted the *Amended Notice* on each of the lots on the Property that were subject to foreclosure.[12] There is no dispute that the debtors had actual notice of the foreclosure sale.

The debtors sought to file a chapter 11 petition to stay the foreclosure and attempt to reorganize. On April 17, 2013, one day prior to the scheduled foreclosure sale, they sent their petition, fee, and other necessary documents to the bankruptcy court by Express Mail through the United States Postal Service ("USPS").[13] Delivery was guaranteed for noon on April 18, 2013. The USPS "Track & Confirm" receipt reflects that the documents were delivered at 11:08 a.m. on April 18th.[14] The petition was docketed and this chapter 11 case was opened on April 18th at 12:12:49 p.m.

---

[10] *Id.*, Ex. G.

[11] Michael Hough purchased Tracts B and F from the debtors sometime after FNBA's *Deed of Trust* was recorded.

[12] *Supplemental Decl. of Erik Niebuhr* (Docket No. 35).

[13] Debtors' Ex. 8.

[14] *Id.*

4

FNBA's foreclosure sale was scheduled for 10:00 a.m. on April 18th. Shortly before it was to commence, Joe Moran, counsel for FNBA, electronically checked this court's case filings to see if the debtors had filed for bankruptcy. Because the USPS had not yet delivered the debtors' petition to the court, Mr. Moran found no filings for the debtors.[15] Assured that no bankruptcy had been filed, FNBA proceeded with the foreclosure sale. There being no other bidders at the sale, FNBA entered an offset bid in the amount of $2,404,536.21 to purchase the Property.[16] Later that same day, FNBA prepared a letter to the debtors advising them of the foreclosure sale and offset bid.[17] Although FNBA had prepared a trustee's deed prior to the foreclosure sale, it discovered the bankruptcy filing before the trustee deed could be executed.[18] FNBA's *Motion* was filed the following week, on April 25, 2013.

## Analysis

FNBA seeks relief from the automatic stay under 11 U.S.C. § 362(d)(1), which authorizes courts to terminate the automatic stay for cause. As the movant, FNBA bears an initial burden to establish that cause exists for relief.[19] Upon meeting that initial burden, the burden shifts to the debtors to show that relief from the stay is not warranted.[20] The Bankruptcy Code does not define cause. Because of this, the bankruptcy court examines

---

[15] *FNBA's Reply to Opp'n* (Docket No. 22), Ex. 1 [*Aff. of Joe Moran*], at ¶ 4.

[16] *Id.* at ¶¶ 5-6.

[17] Debtors' Ex. 7.

[18] *Aff. of Dianne Wamhoff* (Docket No. 23), ¶ 4.

[19] *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996).

[20] *Id.*; 11 U.S.C. § 362(g)(2).

5

cause on a case by case basis, and has broad discretion in granting relief from stay under § 362(d)(1).[21]

### A. The Debtors Hold Only Bare Legal Title to the Property.

This case presents a recurring fact pattern in which debtors file a bankruptcy petition after a foreclosure has occurred. In such instances, state law defines what, if any, interest the debtors bring with them into bankruptcy. If, under applicable law, debtors hold only bare legal title, cause exists to modify the stay to permit the creditor to take such steps that may remain to complete the sale.[22] This is because the only duty of the debtors in such a situation is to release legal title to the equitable title holder.[23]

Judge Ross applied Alaska law to such a case in *In re Macavilca*.[24] As in the instant case, the secured creditor in *Macavilca* acquired real property by offset bid at a nonjudicial foreclosure sale. The trustee of the deed of trust prepared and signed the trustee's deed, but the debtor filed his bankruptcy petition before the deed could be recorded. Despite the bankruptcy filing, the trustee recorded the deed post-petition. The creditor moved to annul the stay to validate the post-petition recording. The court reviewed AS 34.20.080 and

---

[21] *Edwards v. Wells Fargo Bank, N.A. (In re Edwards)*, 454 B.R. 100, 106 (B.A.P. 9th Cir. 2011).

[22] *In re Madison,* 438 B.R. 866, 870 (Bankr. D.S.C. 2010) ("Where debtor has been divested of all but bare legal title through a foreclosure sale, cause exists to grant relief from the automatic stay to permit Creditor to conclude any act remaining in the sale process and take possession of the property."); *see also In re Edwards*, 454 B.R. at 106 (relief from stay for cause appropriate where foreclosure completed under California law and debtors was essentially a "squatter.").

[23] *In re Bardell,* 361 B.R. 468, 476 (Bankr. N.D. W.Va. 2007), *aff'd* 374 B.R. 588 (N.D. W.Va. 2007), *aff'd* 294 Fed.Appx. 47 (4th Cir. 2008).

[24] 7 ABR 500 (Bankr. D. Alaska 2004).

AS 34.20.090, the pertinent Alaska statutes governing nonjudicial foreclosures, and concluded that a foreclosure sale divested a debtor only after execution and delivery of the trustee's deed.[25] Because the trustee had executed the trustee's deed prior to the bankruptcy filing, the issue narrowed to whether the deed was delivered in satisfaction of the statutory requirement.

Judge Ross reviewed Alaska's limited case law on delivery, and concluded that "delivery will be presumed when the deed is executed with the intent to send it for recording."[26] The deed of trust trustee had executed the deed and placed it within its internal system for recording prior to the petition date. As a result, equitable title transferred to the purchaser before the debtor filed his bankruptcy petition. Even absent recording the trustee's deed, the debtor had "no interest in the [property] except, essentially, the rights of a squatter (i.e. a person having no legal right to remain in possession)."[27] Cause under § 362(d)(1), therefore, existed to lift the stay to allow the creditor to evict him.

Under *Macavilca,* the debtors would retain an equitable interest in the Property, notwithstanding the fact that the foreclosure occurred prior to the opening of their case, because their petition was filed before the trustee's deed was executed. However, in 2010, under HB 108, the Alaska Legislature amended AS 34.20.080 to include a new subsection (i), which succinctly states, "[u]nless a sale is rescinded under (g) of this section, the sale

---

[25] *Id.* at 507-508.

[26] *Id.* at 511.

[27] *Id.* at 512.

7

completely terminates the rights of the trustor of the trust deed in the property."[28] Subsection (g) of the amended statute now permits the trustee of the deed of trust to rescind a foreclosure sale within 10 days if "the trustee determines that the sale should not have proceeded."[29] As of the petition date, the trustee had not rescinded the foreclosure sale. Neither counsel, nor the court, have found any Alaska cases that analyze or apply either subsection (i) or (g).[30] FNBA does cite the sponsor statement for HB 108, issued by Representative Jay Ramras, which indicates that the bill was submitted to modernize and improve the foreclosure process, as well as define "when one's rights are terminated in the foreclosure process."[31]

Unlike AS 34.20.080, the current wording of AS 34.20.090 remains unchanged from the version construed in *Macavilca*. Specifically, AS 34.20.090(a) provides that "[t]he sale and conveyance transfers all title and interest that the party executing the deed of trust had in the property sold at the time of its execution, together with all title and interest that party may have acquired before the sale."[32] AS 34.20.090(b) further provides that the purchaser at a nonjudicial foreclosure is entitled to possession only after execution and recording of the

---

[28] AS 34.20.080(i).

[29] AS 34.20.080(g).

[30] At the preliminary hearing, the court asked the parties to brief the impact of AS 34.20.080(i).

[31] FNBA Ex. M; s*ee also* FNBA Ex. N, at 3.

[32] AS 34.20.090(a). Further, there is no right of redemption after a nonjudicial foreclosure sale "unless the deed of trust so declares." *Id.* The *Deed of Trust* executed by the debtors did not provide a right of redemption. *See* FNBA's Ex. B at 8-9.

8

trustee's deed. Despite the amendment of AS 34.020.080, execution and delivery of the trustee's deed is still required to transfer legal and equitable title to the *purchaser*, and to vest that purchaser with the right of possession.[33] What has changed, however, is that under AS 34.20.080(i), a foreclosure sale will divest and completely terminate the rights of the trustor of the deed of trust. The 2010 amendment to AS 34.20.080 makes execution and delivery of the trustee's deed a ministerial act, insofar as the debtor's rights in the property are concerned.[34]

Here, the debtors were the trustors under the *Deed of Trust* in favor of FNBA. The foreclosure sale held April 18, 2013, statutorily divested the debtors of their *equitable* title to the Property, leaving them with bare legal title.[35] Because the debtors' bare legal title provides no benefit to the estate, cause exists to terminate the automatic stay to permit the trustee to execute the trustees' deed and for FNBA to record that deed.

### B. Debtors' State Law Challenges to the Foreclosure Sale Do Not Negate Cause to Terminate the Automatic Stay to Document the Foreclosure Sale.

The debtors also challenge the propriety of the foreclosure sale, and ask that the court declare the sale void. In support of their argument, they contend that FNBA: (1) improperly noticed the foreclosure sale, (2) included tracts it was not entitled to foreclose in the sale, and (3) received inadequate consideration despite the offset bid of $2,404,536.21. The debtors'

---

[33] AS 34.20.090(b).

[34] *See* AS 34.20.080(b) ("Except as provided by (g) of this section, the trustee shall execute and deliver to the purchaser a deed to the property sold.")

[35] AS 34.20.080(i).

9

claims raise an initial question regarding the proper scope of relief from stay proceedings; specifically, whether such claims can or should be considered as a defense to FNBA's *Motion*. Relief from stay matters are summary proceedings, meant to provide a quick resolution as to the continued application of the stay rather than a full adjudication of all claims or defenses related to a secured creditor's claims.[36] For this reason, in considering whether to grant relief from stay, courts are limited to determining whether the movant has a colorable claim to the relief sought.[37]

There is no dispute that the debtors owe FNBA over $2 million on a *Note* that matured well over a year ago. Nor is there any dispute that FNBA has a *Deed of Trust* encumbering the foreclosed property, or that FNBA gave the debtors notice of the foreclosure sale. FNBA has demonstrated that it had the right to foreclose upon the Property under Alaska law. Moreover, it has demonstrated its efforts to comply with Alaska's statutory requirements to conduct a non-judicial foreclosure, including notice as required by AS 34.20.070. Finally, FNBA's credit bid at the foreclosure sale exceeded $2 million, hardly a nominal amount. For the limited purposes of its motion, FNBA has established a colorable claim to the relief sought.[38]

---

[36] *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 31 (1st Cir. 1994)(citing *Matter of Vitreous Steel Products Co.,* 911 F.3d 1223, 1232 (7th Cir. 1990)); *see also Veal v. Am. Home Mort. Serv., Inc. (In re Veal)*, 450 B.R. 897, 914 (B.A.P. 9th Cir. 2011)(citing *Grella*).

[37] *Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 740 (9th Cir. 1985), overruled on other grounds, *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.,* 549 U.S. 443 (2007); *Grella,* 42 F.3d at 34; *In re Salmon Falls Resort, LLC,* 9 A.B.R. 244, 248-249 (Bankr. D. Alaska 2009).

[38] *See generally In re Aniel,* 427 B.R. 811, 816 (Bankr. N.D. Cal. 2010).

**Conclusion**

For the reasons set forth above, the foreclosure sale occurred prior to the bankruptcy filing, and terminated the debtors' interests in the Property under current Alaska law. FNBA's *Motion* will be granted. This is not to say that the debtors are without remedy. They remain free to pursue their state law claims in another context.

The court shall enter a separate order consistent with this *Memorandum*.

DATED: July 15, 2013.

> BY THE COURT
>
> /s/ Gary Spraker
> GARY SPRAKER
> United States Bankruptcy Judge

Serve:  Thomas Taffe, Pro Se Debtor
        Devony Lehner, Pro Se Debtor
        Bruce Moore, Esq.
        William Courshon, Esq.
        U. S. Trustee